In the Matter of MORTON S. COAN, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, May 21, 1943.

*Samuel C. Lewis* of counsel (*Einar Chrystie*, attorney), for petitioner.

*Alvin C. Cass* of counsel (*Cass, Bacal & Castaldi*, attorneys), for respondent.

*Per Curiam.* The referee has reported that during the years 1931 to 1935, inclusive, the respondent engaged in the practice of making fictitious claims and instituting actions based thereon and of inducing defendants, prospective defendants and their insurance carriers to make payments in settlement thereof.

The respondent opposes the motion to confirm the referee's report, upon the ground that there is no direct evidence to support the findings. He urges that while there are suspicious facts and circumstances, his explanation thereof is uncontradicted and, therefore, should have been accepted by the referee.

In 1935 the Greater New York Taxpayers Mutual Insurance Association charged the respondent with having made fictitious claims in the names of eighteen or nineteen claimants. An

investigation followed. During the pendency thereof the respondent offered to restore the amounts received in all cases where the claimants could not be located. This offer was made by the respondent in writing as follows: " To protect the memory of his father Mr. Coan is desirous of restoring to the company which was paid in these cases in settlement with people who cannot be located.. This, however, is conditioned upon two things, one, that the absolute innocence of Mr. Morton S. Coan against every charge be first established; two, that the Insurance Department approve such restitution."

The matter was referred to the District Attorney, New York County. After conducting an investigation of the respondent's records, the District Attorney sent the entire matter to the Association of the Bar of the City of New York. An investigation by the latter resulted in the filing in this court of a petition containing charges of professional misconduct as follows: " IV. That Morton S. Coan, the respondent, has been guilty of misconduct as an attorney at law as follows: That during the years 1931 and 1935 inclusive the respondent made claims and instituted actions in the names of approximately one hundred and forty alleged claimants whom the respondent knew or had reason to believe were either entirely fictitious or were not the individuals whom the respondent represented them to be, and whose alleged injuries he knew or had reason to believe had either never in fact been sustained or were the result of accidents deliberately planned for the purpose of collecting a settlement; and that in many of such cases the respondent induced defendants, prospective defendants and their carriers to pay sums aggregating over $7,000 in settlement of the alleged claims and converted part or all of said sums to his own use."

On the hearings before the referee, the respondent testified that he maintained offices at 277 Broadway, New York City, and at 60 Court Street, Brooklyn, as well as in the home of his father, Harry Coan, at 253 East Broadway, New York City. He testified that his father (who died in 1935 at the age of seventy years) had been born in and at all times resided in the same neighborhood on the lower east side of Manhattan. Because of his long residence and many connections with fraternal and political organizations, respondent's father was a well-known person in the neighborhood. As a result of the fact that many of the people in the locality frequently called upon his father for advice, the latter was on many occasions able to recom-mend the respondent as an attorney.

It is contended by the respondent that each of the 140 cases which have been made the basis of these charges was recom-mended to the respondent by his father. In fact, the respond-

ent referred to them as his " father's cases " and testified that his father did most of the work in connection with them. On the hearings before the referee the respondent admitted that he did not have in his possession the present address of any of the 140 claimants and that each of the given addresses was fictitious. Respondent's attorney stated that the wrong addresses were given because the claimants " were afraid of investigators from casualty companies coming to their place of business or coming to their employers, were fearful of losing their jobs." The respondent, however, testified that he did not know why the correct addresses were not disclosed by his father. He later testified that his father " handled things the way he wanted to handle things and nobody could tell him anything." In answer to questions asked by Official Referee, David L. Weil, the respondent then gave the following testimony: " * * * It may have been he thought that was the best way to handle them. The Referee: By giving you fictitious addresses? The Witness: By not giving me the correct addresses, so I could not give them to the companies. That is the surmise on my part towards him. Q. These claims, did he express any desire, did he act in a manner of handling those things himself, so far as possible or did he leave everything to you? A. I think I have so testified, he handled everything in connection with the claim except the physical examination at my office. The Referee: There was nothing much to handle, was there, excepting the service of the summons and the physical examination. The Witness: Talking with the client, telling him about the offer made, and so forth. The Referee: You never spoke to the clients at all? The Witness: Oh, yes, of course I did occasionally, but I would leave that all to my father, because he could handle them and I could not, in many cases. His business on the east side was entirely handled by him."

In view of the possibility that the foregoing testimony might create the impression that the father of the respondent was an attorney, it may now be stated that except for a few years during which he served as a clerk in one of the city departments, he was in the merchant tailoring business on the east side.

The evidence clearly establishes that the aforesaid 140 cases were fictitious. In not one of the cases was there any correspondence with a client. An examination of the files in the cases disclosed that most of them contained a statement of facts in the handwriting of the respondent (given him verbally by his father or the claimant); a statement (unsigned and

undated) in the handwriting of a clerk or investigator concerning an investigation at the scene of the accident, but disclosing no contact with the alleged claimant; an undated certificate from an examining or treating physician; the pleadings in the cases in which actions had been instituted and some correspondence with the defendants and their attorneys. Not one of the 140 cases was ever tried or even noticed for trial. If the case was not settled, it was dropped, discontinued or dismissed for lack of prosecution. When a case was dropped, the respondent made a notation in the file in his own handwriting to the effect, among others, that the client had left home, did not wish to go to court, or had refused to pay the balance of the fee. Concededly, he never confirmed the dropping or discontinuance of a suit by letter to a client, or attempted to obtain an authorization in writing for its discontinuance.

It is significant that in not one of the 140 cases was there a signed retainer and that not one of them was taken on a contingency basis. In his regular practice conducted at his Broadway and his Court Street offices he obtained signed retainers in all cases and in each personal injury action was retained on a contingency basis. It is his contention that in each of the cases now under consideration he was retained for a fixed sum of money which was paid in advance in cash or in small weekly installments. His explanation of this departure from his usual practice is given in the following testimony: '' The Referee: How is it that in 140 cases that emanate from 253 East Broadway you exacted cash retainers and other cases you accepted written retainers? The Witness: The cases that came to 277 Broadway were people known to me or recommended by people whom I knew; the cases that came to 253 Broadway came entirely through my father and his connections. I should say about ten years back now I found we were having a great deal of difficulty with clients when it came to taking out the contingent fee, because at that time I was handling most of them on a contingent basis. Owing to my father's political and fraternal connections there were so many cases where clients complained that we should not have 50 or even 33½, sometimes not even 25 per cent.; they thought because of my father's political connection and fraternal connections and because they came to him that the work should be done by him like political work should be done, for nothing. I told my father ' I can't be annoyed with these things; these people are coming in through you; they are your people. If

they want me to handle cases I want a fee; whatever we get out of the case will be theirs.' "

In each case in which a payment was made to an alleged claimant, the check of the defendant, purported to be endorsed by the claimant and the respondent, was deposited in respondent's account. The respondent then drew his check to the order of the claimants for the full amount of the settlement. The name of the claimant was then endorsed on the check at the bank of the respondent. In no instance was the check ever cashed by a claimant. In this manner, the proceeds of the settlements in 113 of the 140 cases, aggregating $7,880, went into the respondent's bank account. The respondent testified that either he or his father paid in cash to each claimant, the entire proceeds of the settlement. There is no credible evidence that any of this money ever reached any claimant and not one claimant was produced to establish such a payment. It is important to note that in his regular practice the net proceeds of the settlement was given to the client, not in cash, but in the form of a check.

Not one of the doctors who were supposed to have treated or at least examined, for the purposes of the action, the 140 alleged claimants had any record of such treatment or services in a single instance. Of the ten who examined a majority of the alleged claimants only five were called as witnesses. Of the others, one had died, one was practicing outside the city, one had been suspended from practice and one was in jail at the time of the hearings. Those who testified were unable to recall a single claimant. They said that they had no records available. Various reasons were given for this condition. One said he destroyed them after a year had elapsed, another said he lost his records when he moved, a third said he had discontinued his general practice to specialize in diseases of the eye and had left his card index records in his old office. One of the doctors testified to a personal visit to the home of a claimant; the address given, however, *proved to be a vacant lot.*

It was conceded by the respondent and by the doctors who testified that in each case the injuries claimed were trivial. A remarkable feature of all is the fact that the injuries in every one of the 140 cases included a sprain of either the left or right ankle, accompanied by contusions, abrasions and other sprains. The doctor's certificates obtained by the respondent read substantially the same, except for variations as to which ankle had been sprained.

Not one of the cases occurred at a place where the claimant either lived or was known. Sixty-three of the injuries were caused by falls alleged to have been sustained while claimant was passing a store or building. Forty-one occurred while claimant was in a building, store, restaurant or beauty parlor for some temporary purpose. In twenty-seven cases the claimant was injured while seeking to rent a store or an apartment. In four instances the claimant was looking for a position.

Twenty-two of the cases were due to falls on broken cellar doors; twenty-six to falls on defective iron gratings; twenty-seven to falls on broken vault lights; fourteen were due to falls on torn rubber mats or carpets and fourteen were due to falls caused by claimant's tripping while leaving an elevator which was not stopped at a level with the floor. Sixteen were due to falls on broken steps or thresholds. Eight were due to falls on defective drains or drain covers. Five were due to falls on broken wooden platforms. Four were due to falls on defective coal-hole covers and two were due to falls on defective sidewalks.

There is also an unusual similarity in the occupations of the alleged claimants. Twenty were said to be cooks or caterers; sixteen were milliners; fourteen were dressmakers or seamstresses; fourteen were manicurists; four were dancing teachers; four were piano teachers; twenty-six were described as married or widowed; thirty-three were described as " Miss," without any occupation being given. In not one case was the name or the address of the claimant's employer given.

Investigators on behalf of the petitioner, the District Attorney of New York County and the Greater New York Taxpayers Mutual Insurance Association testified that, with but two exceptions, no person bearing the name of a claimant had been found at the address given by respondent. In the two cases where persons with similar names were found, those persons testified they had no accidents, had sustained no injuries and had not retained the respondent. Of the addresses given as the residences of the claimants, the investigators found that, in fourteen instances, such addresses did not exist; that in two instances vacant lots were located at the designated place. In other cases, the addresses given were those of factories or shops, a public library, a church, a synagogue, a garage and a city playground.

A tabulation of the ages of the claimants, as given by the respondent, reveals that 115 of them came within nine age groups. Sixteen were twenty-two years old, nineteen were

twenty-three years old; eighteen were twenty-four years old; nine were twenty-five years old; nine were forty-four years old; sixteen were forty-five years old and eight were forty-six years old.

Thirty-one of the claimants were residents of and were injured in Brooklyn. Eight were residents of and were injured in the Bronx. Nevertheless, all thirty-nine of them were treated by doctors having offices on the lower east side of Manhattan.

A study of the duplication of alleged addresses of the residences of respondent's clients reveals that in fifteen different instances one address was given as the residence of two claimants; that six addresses were each used by three claimants; that three addresses were each used by four claimants; that two addresses were each used by five claimants and that one address was used by each of six different claimants.

Notwithstanding that an attorney named Frank S. Efron who shared the respondent's office at 277 Broadway was a notary public, he never took the acknowledgment of a single document signed by any of the 140 clients. All documents purporting to have been signed by such clients were said to have been acknowledged before notaries whom the respondent claimed he did not know. Not a single notary or commissioner of deeds purporting to have taken such acknowledgments was produced.

The foregoing constitute the essential facts and circumstances and with respect to them there is no dispute. In addition, however, the petitioner called a handwriting expert named Elbridge W. Stein. He testified that he personally examined the signatures of the alleged claimants in ninety-three cases. In each case there were from one to four signatures of the alleged claimant. He testified, in part, as follows: " Q. Will you tell us the purpose of your examination? A. The purpose of my examination in examining these signatures was to determine, if possible, whether or not any number of these signatures, that is, of different names were written by the same writing, that is, whether the names in different cases were written by the same writer; also whether all of the names in a case were written by the same writer; also whether or not these signatures or names were in my opinion signatures, that is, written by a person as a signature or whether they were written merely as names by a person whose name was not the one written on these papers."

His conclusion, after he had examined the signatures, was set forth in the following testimony: " Q. Did you find, as a

result of your examination, that more than one name was written by the same person?  *  *  *  A. Yes.  Q. All right. A. That is, names in different cases; a number of these, in my opinion, written by the same writer in the same case.  The answer to the question means that there were some cases where the same writer wrote the name in one case and that same writer wrote the name in another case.  Q. Among these papers which you have had for examination will you pick out those which you can say definitely were written by the same person? [Handing files to witness].  *  *  *  A. (Continuing) That is right, Exhibit 27.  And in my opinion, the signature on Petitioner's Exhibit 24, Mildred Gottdank was written by the same writer who wrote the signature on Petitioner's Exhibit 25-H and 26.  I am also of the opinion that the signature Beatrice Russak was written — that is on Exhibit 19-S, Petitioner's Exhibit 19-S, in my opinion that signature was written by the same writer who wrote Beatrice Tobin on Petitioner's Exhibit 15-N, Petitioner's Exhibit 18 and Petitioner's Exhibit 17. Mr. Cass: 15-N, 18 and 17 are all in the same case, Beatrice Tobin.  The Witness: That is right.  In other words, the Beatrice Tobin signatures, in my opinion, were written by the writer who wrote the Beatrice Russak signature.  By Mr. Lewis:  Q. Those signatures are all on Petitioner's Exhibit 20, are they not?  The photostat reproduced?  A. Yes.  In my opinion further the signature Estelle Ledder was written — on Exhibit 12-K and Exhibit 13, written by the same [person who] wrote Estelle Lubin on Petitioner's Exhibit 10-P and 11. Those are on the photostat.  Q. Exhibit 38, is that correct.  A. Exhibit 38, that is correct.  Those are the signatures that I can say definitely in my opinion, were written by the same writer; that is, those sets of signatures.  There is another group of signatures that have a very close relation to each other but which in my opinion do not rise quite to the high degree of certainty that I require for identification.  They are quite closely related as bearing upon whether or not the same writer wrote more than one set of signatures.''

In view of the above testimony and that given by the respondent, that he personally interviewed each of the 140 claimants, it is evident that in at least three cases the alleged claimants were persons whom the respondent had represented on prior occasions under other names.  The uncontradicted testimony of the handwriting expert establishes that the signatures of the alleged claimant in the cases of Beatrice Russak and Beatrice Tobin were signed by one person; that in the cases of

Estelle Ledder and Estelle Lubin, one person signed as claimant, and in the cases of Mildred Gottdank and Mildred Landau, all the signatures were by the same person. It is incredible that this respondent should not have learned that some of his claimants were persons whom he had represented on prior occasions under other names. His claim of innocence of any knowledge of or participation in any fraud is unworthy of belief.

On the evidence presented, the referee concluded that the conduct of the respondent was in furtherance of a scheme to defraud. His report contained the following: " A careful consideration of all the evidence leads me to the conclusion that the respondent was the master mind in a scheme to defraud defendants in negligence cases, assisted by others undisclosed by the evidence. The scheme was so adroitly planned that an investigation of an individual case would show a case record meticulously kept in the handwriting of the respondent. The scheme, however, was unfolded when the lights were turned on in an examination of the 140 alleged claims which are the basis of the charges contained in the petition herein. The fictitious addresses of the 140 alleged claimants; the duplication of addresses of alleged claimants; the failure to produce a single claimant to give testimony; the failure of the doctors who testified to recall any one of the 140 alleged claimants or to produce a single scrap of paper identifying in any way any of the claimants and their uniform statements that they had destroyed their records and the production of undated certificates; the failure to produce any of the mothers who accompanied their daughters at the time of the alleged accidents; the fact that the injuries resulting from the alleged accidents being nothing more than a sprain or a contusion, the amounts recovered ranging from $25 to $150; the fact that where there was no settlement in any of the 140 cases the case was either dismissed for lack of prosecution or dropped, the file containing a note in the handwriting of the respondent giving as a cause for such lack of prosecution ' client phoned was going to live with a sister in Pittsburgh,' ' client wants no further action,' ' client says no Court,' 'client phoned and said that she was going to be married,' ' client refused to pay any fee,' ' client does not want to go to Court,' ' client phoned if no settlement drop case,' and so forth; the fact that although the respondent had ample time to produce at least one of the alleged clients he failed to do so; the fact that none of the witnesses except the respondent had ever seen any of the claim-

ants; the fact the respondent claimed that his father was a patriarch in the particular neighborhood and was active in political and fraternal organizations lacks probative force in that not one person associated with any organization was produced to testify to his father's activity; the fact that not a single notary or commissioner of deeds, who was supposed to have taken the acknowledgments of these claimants to releases and so forth, was produced; the fact that no reason has been shown why claimants living miles away from the East side residence of the father should come to consult him, a man unidentified with the law; the fact that the method of keeping records that the respondent adopted in his general practice in negligence cases was entirely different from that followed in the 140 cases; the fact that in his general practice he knew his clients and had signed retainers from them, whereas in these 140 cases he admitted that he had no knowledge of the identity of any of them and testified that they all came to him at his East Broadway office through his father, no claimant having been in his Broadway office in Manhattan or in his Brooklyn office on Court Street; the fact that the records in the 140 cases were all in the handwriting of the respondent and were almost identical in phraseology; the fact that the practice was identical and that in each case there would be a retainer paid in cash, a memorandum in his handwriting placed in the file, a claim letter written, and a memorandum as to what disposition had been made in the case, all these facts and the inferences to be drawn therefrom indicate that the respondent by his exactitude of detail in these 140 cases overreached himself and plainly indicate a preconceived scheme to defraud.''

The respondent should be disbarred.

MARTIN, P. J., TOWNLEY, DORE, COHN and CALLAHAN, JJ., concur.